IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

TRACI BRUMBLES,                         )
                                        )
                Plaintiff,               )
                                        )
        v.                              )       1:17CV953
                                        )
NANCY A. BERRYHILL,                     )
Acting Commissioner of Social Security, )
                                        )
                Defendant.              )

MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Traci Brumbles ("Plaintiff") brought this action pursuant to Section 205(g) of the Social Security Act (the "Act"), as amended (42 U.S.C. § 405(g)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for Disability Insurance Benefits ("DIB") under Title II of the Act. The parties have filed cross-motions for judgment, and the administrative record has been certified to the Court for review.

I.      PROCEDURAL HISTORY

Plaintiff protectively filed her application for DIB on December 10, 2013, alleging a disability onset date of December 6, 2013. (Tr. at 18, 159-165.)[1] Her claim was denied initially (Tr. at 63-74, 89-92), and that determination was upheld on reconsideration (Tr. at 75-88, 94-97). Thereafter, Plaintiff requested an administrative hearing de novo before an Administrative Law Judge ("ALJ"). (Tr. at 102.) Following the subsequent hearing on September 22, 2016,

---

[1] Transcript citations refer to the Sealed Administrative Record [Doc. #7].

the ALJ concluded that Plaintiff was not disabled within the meaning of the Act (Tr. at 29-30), and, on August 22, 2017, the Appeals Council denied Plaintiff's request for review of that decision, thereby making the ALJ's conclusion the Commissioner's final decision for purposes of judicial review. (Tr. at 1-6.)

II.     LEGAL STANDARD

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, "the scope of [the] review of [such an administrative] decision . . . is extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ [underlying the denial of benefits] if they are supported by substantial evidence and were reached through application of the correct legal standard." Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) (internal brackets omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1993) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the

[ALJ]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472. "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

In undertaking this limited review, the Court notes that in administrative proceedings, "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" Id. (quoting 42 U.S.C. § 423(d)(1)(A)).[2]

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4)). "Under this process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the

---

[2] "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program . . . provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program . . . provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1 (internal citations omitted).

requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy." Id.

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first two steps, and establishes at step three that the impairment "equals or exceeds in severity one or more of the impairments listed in Appendix I of the regulations," then "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's residual function[al] capacity ('RFC')." Id. at 179.[3] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds

---

[3] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that pursuant to the administrative regulations, the "RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (*e.g.*, pain)." Hines, 453 F.3d at 562-63.

4

to the fifth step, which "requires the Commissioner to prove that a significant number of jobs exist which the claimant could perform, despite [the claimant's] impairments." Hines, 453 F.3d at 563. In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.

III. DISCUSSION

In the present case, the ALJ found that Plaintiff had not engaged in "substantial gainful activity" after December 6, 2013, her alleged onset date. (Tr. at 20.) Plaintiff therefore met her burden at step one of the sequential evaluation process. At step two, the ALJ further determined that Plaintiff suffered from the following severe impairments:

> obesity, osteoporosis, anxiety, migraines, and asthma.

(Tr. at 20.) The ALJ found at step three that none of these impairments met or equaled a disability listing. (Tr. at 21.) Therefore, the ALJ assessed Plaintiff's RFC and determined that she could

> perform light work as defined in 20 CFR 404.1567(b) except only occasional posturals, but avoid workplace hazards. She can follow short, simple instructions and perform routine tasks, but no work requiring a production rate or demand pace. She is able to sustain attention and concentration for 2 hours at a time. She should avoid work environments dealing with crisis situations, complex decision making, or constant changes in a routine setting. She should avoid concentrated exposure to respiratory irritants.

5

(Tr. at 23.) Based on this determination, the ALJ found under step four of the analysis that Plaintiff could not perform any of her past relevant work. (Tr. at 28.) However, the ALJ concluded at step five that, given Plaintiff's age, education, work experience, and RFC, along with the testimony of the vocational expert regarding those factors, Plaintiff could perform other jobs available in the national economy and therefore was not disabled. (Tr. at 28-30.)

Plaintiff now raises three challenges to the ALJ's decision. Specifically, she claims that the ALJ (1) failed to "evaluate Plaintiff's DHI [immune deficiency] and how her frequent absences due to chronic sinusitis and other infections affect her ability to hold a full time job," (2) failed to evaluate the effect of Plaintiff's frequent migraines on her ability to hold a full time job, and (3) failed to evaluate the effect of Plaintiff's use of portable supplemental oxygen on her RFC. (Pl.'s Br. [Doc. #9] at 1.) After a careful review of the record, the Court concludes that none of Plaintiff's contentions merit remand.

A. Immune Deficiency

Plaintiff first argues that the ALJ erred by failing to evaluate Plaintiff's deficiency of the humoral immunity ("DHI") and the vocational effects of resulting chronic sinusitis and respiratory infections. Specifically, Plaintiff argues that it was legal error for the ALJ not to include Plaintiff's DHI among her severe impairments at Step Two or to mention it elsewhere in her decision. Plaintiff further contends that the ALJ improperly failed to evaluate how Plaintiff's recurrent sinusitis and other infections due to DHI result in frequent absenteeism, which Plaintiff argues renders her disabled.

> Step two is a threshold determination of whether claimants have a severe impairment (or combination of impairments) that meets the twelve-month duration requirement and significantly limits their ability to do basic work activities. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii) (2010). If the

6

> Commissioner finds no severe impairments, the claimant is not disabled and the analysis does not proceed to the other steps. Id. However, if a claimant does have a severe impairment or combination of impairments, the ALJ must consider the effects of both the severe and non-severe impairments at the subsequent steps of the process, including the determination of RFC. See 20 C.F.R. § 404.1523 (2010); SSR 96–8p, 1996 WL 374184, at * 5 (1996); SSR 86–8, 1986 WL 68636, at *5 (1986). If the ALJ proceeds to discuss and consider the non-severe impairment at subsequent steps, there is no prejudice to the claimant. See Thomas v. Commissioner, Soc. Sec. Admin., No. SAG–11–3587, 2013 WL 210626, at *2 (D. Md. Jan. 17, 2013) (finding harmless error where ALJ continued with sequential evaluation process and considered both severe and non-severe impairments); Kenney v. Astrue, No. CBD–10–1506, 2011 WL 5025014, at *5 (D. Md. Oct. 20, 2011) (declining to remand for failure to classify an impairment as severe because it would not change the result).

Rivera v. Astrue, No. CBD-12-1095, 2013 WL 4507081, at *7 (D. Md. Aug. 22, 2013). In other words, "[a]s long as the ALJ determines that the claimant has at least one severe impairment and proceeds to discuss all of the medical evidence, any error regarding failure to list a specific impairment as severe at step two is harmless." McClain v. Colvin, No. 1:12CV1374, 2014 WL 2167832, at *4 (M.D.N.C. May 23, 2014) (citations omitted). Therefore, in considering the alleged error at step two in this case, the Court also considers the ALJ's analysis at subsequent steps in the sequential analysis.

In the present case, the ALJ determined that Plaintiff had the following severe impairments: obesity, osteoporosis, anxiety, migraines, and asthma. (Tr. at 20.) The ALJ did not include DHI, chronic sinusitis, or recurrent upper respiratory infections among Plaintiff's severe or non-severe impairments. Despite Plaintiff's contentions to the contrary, however, in assessing Plaintiff's RFC, the ALJ expressly addressed medical records reflecting Plaintiff's 2015 diagnosis of primary immune deficiency. (Tr. at 26, 27, 669, 757.) For example, in discussing the medical evidence, the ALJ noted that Plaintiff

7

> had recently been diagnosed with a primary immune deficiency. She had a history of asthma for 10-12 years and recurrent sinus infections.

(Tr. at 26.) In addition, the ALJ noted that Plaintiff

> was seen by her allergist on November 2, 2015 for follow-up of immune deficiency. It was noted that no rescue inhaler had been needed lately, [Plaintiff] was doing very well, and she denied asthma or allergy symptoms.

(Tr. at 27.) Thus, the ALJ did consider Plaintiff's DHI in assessing Plaintiff's impairments. While the ALJ did not expressly discuss each of the medical records relating to Plaintiff's immune deficiency, an ALJ is not required to address every piece of evidence. See Brewer v. Astrue, No. 7:07–CV–24–FL, 2008 WL 4682185, at *3 (E.D.N.C. Oct.21, 2008) (collecting cases). "[S]o long as the narrative opinion is sufficien[tl]y detailed and cogent on the ultimate issues for the reviewing court to follow the ALJ's logic and reasoning and supported by substantial evidence in the record, then the lack of specific findings on more subordinate issues . . . does not require reversal." Mellon v. Astrue, No. 4:08–2110–MBS, 2009 WL 2777653, at *13 (D.S.C. Aug.31, 2009). Here, the ALJ's decision specifically includes discussion of Plaintiff's immune deficiency. Moreover, while Plaintiff argues that asthma and "exacerbations of that condition as well as frequent infections such as sinusitis and bronchitis due to her compromised immunity renders her disabled," the ALJ appropriately focused on the functionally-limiting effects of Plaintiff's impairments rather than the source of Plaintiff's impairments. Thus, the ALJ not only considered evidence of immune deficiency, but she addressed medical and non-medical evidence with respect to Plaintiff's asthma and recurrent infections in assessing Plaintiff's RFC, focusing on the functionally-limiting effects of Plaintiff's impairments. (Tr. at 23-30.) In the circumstances, the Court does not find any error in the consideration of Plaintiff's DHI.

In a related argument, Plaintiff also challenges the ALJ's failure to include a limitation in the RFC that Plaintiff would be absent from work on an unscheduled basis three to four days per month, contending that the "ALJ did not properly evaluate [Plaintiff's] absences due to her frequent sickness from her compromised immune conditions." (Pl.'s Br. at 9.) Plaintiff references the Vocational Expert's ("VE") testimony, in response to questioning from the ALJ, that unscheduled absences 3-4 days per month would preclude Plaintiff from performing the identified jobs of laundry folder, DOT369.687-018; cashier II, DOT 211.462-010; and inspector and hand packager, DOT 559.687-074. (Tr. at 29, 54-55.) Plaintiff argues that record support for Plaintiff's allegations of frequent absenteeism demonstrate that this case should be remanded based on the VE's testimony.

However, the ALJ did not adopt those limitations posed to the VE, and the ALJ adequately explained her RFC determination with substantial support from the record. In assessing Plaintiff's RFC, the ALJ noted that, in 2015, Plaintiff had been "diagnosed with a primary immune deficiency" and that "[Plaintiff] had a history of asthma for 10-12 years and recurrent sinus infections." (Tr. at 26, 674.) Plaintiff testified that she frequently missed work due to colds that developed into sinus infections and then asthma. (Tr. at 23, 47.) She reported having low energy when sick and that she would "just try and rest and not aggravate [her] breathing" when she had sinus infections. (Tr. at 23, 47-48.) Plaintiff alleged that she was missing approximately 5-10 days per month due to infections and migraines. (Tr. at 23.) However, the ALJ found that Plaintiff's "allegations and testimony concerning the severity of her impairments, symptoms, and functional limitations are not fully consistent with the objective evidence." (Tr. at 28.)

The ALJ first noted that while Plaintiff testified that she frequently missed work because she was sick, that she "had only one brief hospitalization for asthma exacerbation." (Tr. 28.) Plaintiff was hospitalized due to acute exacerbation of asthma from January 31, 2014 to February 3, 2014. (Tr. at 449-482.) Plaintiff presented with difficulty breathing, chest discomfort, chest tightness, nasal congestion, and a nonproductive cough. (Tr. at 449.) The ALJ noted that Plaintiff improved with steroids and nebulizer treatments, that she was "stable at discharge," that "her lungs were clear to auscultation," that her breathing was not labored, and that she "had much improved air movement." (Tr. at 25, 472.) The hospital prescribed Plaintiff oxygen to be used on an as needed basis. (Tr. at 472.) In February 2014, Plaintiff followed up with pulmonologist Dr. Horner "for evaluation of a history of exercise-induced asthma and chronic, recurring symptoms with frequent exacerbations due to upper respiratory tract infections." (Tr. at 25-26, 507.) While Plaintiff reported quitting her job in November 2013 due to exercise induced asthma and indicated she had frequent infections/sinusitis that exacerbated her condition, the ALJ noted that Dr. Horner's treatment records indicated the following:

> On physical examination, [she] had no respiratory distress, her chest was clear, she had no edema, and she had 5/5 muscle strength…. Dr. Horner interpreted [pulmonary function tests] as showing mild obstruction without a significant bronchodilator response. He prescribed Dulera and Spiriva, and instructed [Plaintiff] to continue with albuterol for rescue use only.

(Tr. at 26, 507.) The ALJ further noted that, in May 2014, Plaintiff reported mild improvement in her shortness of breath, that her pulmonary tests showed only mild obstruction, and that "Dr. Horner noted [Plaintiff's] asthma was better controlled, that he continued the same medications," and that he encouraged Plaintiff to exercise as tolerated. (Tr. at 26, 505.) In

10

August 2014, Plaintiff's medical records indicate "good breath sounds bilaterally with no expiratory wheezing." (Tr. at 26, 622.) Plaintiff indicated that she had been able to better comply with CPAP for sleep apnea and was experiencing less dyspnea during the day. The ALJ noted that at that August 2014 visit, "Dr. Walls concluded that [Plaintiff's] overall asthma control appears to be adequate and she is using her albuterol less than 2 times per week with no nocturnal symptoms....Plaintiff's CPAP use improved with improvement in her sinus symptoms, and [Plaintiff] reported that she felt she was clinically improved." (Tr. at 26, 623.) Plaintiff underwent an exercise challenge on a treadmill at Allergy, Asthma & Immunology in November 2014, which reflected "no evidence of EIB (Exercise-Induced Brochospasm) with exercise." (Tr. at 27, 703.) Dr. O'Connor instructed Plaintiff to continue her current medications. (Id.) The ALJ noted that Plaintiff saw her allergist again in December 2014 complaining of nasal congestion. However, Plaintiff's physical exam was within normal limits, "respiratory examination showed no cough, no labored breathing accessory muscle use or retractions. The lung sounds were clear upon auscultation, bilaterally, without wheeze, rales, or crackles." (Tr. at 27, 697-700.)

The ALJ noted additional signs of improvement of Plaintiff's condition in 2015. Specifically, Plaintiff reported to her allergist in November 2015 that "no rescue inhaler had been needed lately," that she was doing well, and did not have asthma or allergy symptoms. (Tr. at 27, 757-759.) The ALJ also noted that "[t]he same was noted in April 2015." (Tr. at 27, 761.) In June 2016, Plaintiff saw her allergist and swapped out her supplemental oxygen tanks for handheld tanks and reported that she had had no new infections in the prior six weeks, that she was breathing "OK," and that she had symptoms only with exercise. (Tr. at

27, 750.) Later that month, Plaintiff presented to an emergency department complaining of upper respiratory infection symptoms lasting four days. Plaintiff reported that she was living in an RV, travelling around the country. "She had no respiratory distress, normal range of motion, no edema, and no motor or sensory deficits. She was diagnosed with acute viral syndrome," and she was given a prescription for antibiotics, and she was instructed to follow up with her primary care physician. (Tr. at 27, 765-67.)[4]

Ultimately, the record simply does not reflect that Plaintiff suffered upper respiratory infections requiring absences from work at the rate suggested by Plaintiff during the relevant period. As noted by Defendant, the record reflects that Plaintiff had a respiratory infection in January 2014 and in March 2014, and acute sinusitis in June 2014, but the records for the remainder of 2014 and all of 2015 reflect that she was doing well and denied recent infections. (Tr. at 27, 449, 523, 624, 519, 596, 592, 705, 702, 698, 761, 757, 670.) In April 2016, she reported that she had had an infection in December 2015/January 2016 (Tr. at 753), but she reported no further infections as of June 2016 (Tr. at 750). During that time, she continued to go out in public, including raising her grandson and going to his school, going to the grocery store, going to the hairdresser, visiting family for meals, and visiting with former coworkers once a week. (Tr. at 22, 24.) She did continue to receive treatment for her asthma and related breathing difficulties, and the ALJ considered all of this evidence and determined that the objective evidence did not does not suggest such severe functional limitations as to preclude

---

[4] While Plaintiff contends that the ALJ improperly "focused on the severity of her asthma itself, as opposed to her frequent sickness with infections and exacerbations of asthma due to immune compromise," the record reflects that Plaintiff indicated that she quit her job due to asthma. Further, the ALJ sufficiently addressed Plaintiff's medical records and testimony with respect to both her asthma and frequent infections, noting improvement in Plaintiff's overall condition.

Plaintiff from maintaining full-time employment. Rather, the ALJ noted that the record generally reflected that Plaintiff's physicians encouraged her to exercise, most of her physical examinations had been within normal limits, and that none of her treating physicians described Plaintiff "as disabled or limited her physical activities in any way." (Tr. 28.) The ALJ did, however, include in the RFC a limitation to light work and, *inter alia*, that Plaintiff "avoid concentrated exposure to respiratory irritants." (Tr. 23.) Given the record as set out at length, the ALJ's decision not to include a limitation based on frequent absenteeism is supported by substantial evidence, and the ALJ included sufficient analysis and discussion to allow for meaningful review.

    B.    Migraines

Plaintiff also argues that the ALJ failed to adequately address Plaintiff's inability to maintain full-time, competitive employment due to frequent absences attributable to migraines. Specifically, Plaintiff contends that the ALJ inaccurately stated that Plaintiff is only in bed once per month due to migraine. (Pl.'s Br. at 10.) Rather, Plaintiff points to her testimony that she suffers 2-4 migraines per month and spends one day in bed for *each* migraine. (Tr. at 48-49.) Thus, Plaintiff contends, Plaintiff is in bed 2-4 days per month due to migraines. Plaintiff argues that, in light of the VE's testimony that Plaintiff would be unemployable if she had 3-4 unscheduled absences per month, Plaintiff's absences from migraines combined with absences from frequent upper respiratory infections render her disabled.

However, the ALJ reasonably relied on Plaintiff's testimony that she only spends one day in bed for each migraine (Tr. at 48), and the medical evidence that she told her doctor in

March 2016 that she was down to only one migraine per month (Tr. at 25, 662). In reviewing the evidence regarding Plaintiff's migraines, the ALJ first noted that Plaintiff alleged that "she missed work 5-10 days per month due to migraines, sickness, and surgeries." (Tr. at 23, 48, 49.) In April 2014, Plaintiff reported to her neurologist that she was having "1 migraine every other week, which lasts about 4 days in duration," and in March 2015, she reported "having 2-3 migraines a month, which was much less than what it used to be." (Tr. at 25, 666, 664.) In March 2015, Plaintiff's neurologist prescribed Sumatripta injections for headache control and, at a March 29, 2016 follow up appointment, Plaintiff indicated that she was experiencing "about one migraine per month." (Tr. at 25, 622.) As the ALJ further noted, Plaintiff reported that "Tinzandine and ibuprofen worked 90% of the time at knocking the headache out, and the injectable Sumatripta worked 100% of the time." (Tr. at 25, 662.) Thus, the record indicates that, as of March 2016, Plaintiff suffered only one migraine per month, and that her headaches were well controlled with medication. Plaintiff's allegations that "she is still missing 2-4 days per month in bed with a migraine" are therefore inconsistent with the medical record. Moreover, a disorder which is controllable with medication is not "disabling." Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986).

Here, the ALJ determined that Plaintiff's migraines were not occurring with such frequency as to render Plaintiff unemployable due to frequent absences. The ALJ reached her conclusion based on the medical evidence, and the ALJ's decision to discredit the extent of Plaintiff's allegations is supported by substantial evidence.

C. Portable Oxygen

Finally, Plaintiff contends that the ALJ improperly failed to account for Plaintiff's use of portable supplemental oxygen in the RFC. At the hearing, Plaintiff testified that if she engages in strenuous activity or walks for more than one hour, she requires use of the oxygen. (Tr. at 49.) Plaintiff argues that, where the ALJ restricted Plaintiff to light work, which requires up to six hours of walking, the ALJ erred by failing to question the VE with respect to "the effect of [Plaintiff's] oxygen use on her ability to perform the jobs cited at Step 5…." (Pl.'s Br. at 11.) Thus, Plaintiff argues, the jobs returned by the VE were based on an incomplete hypothetical.

"To be relevant or helpful, a vocational expert's opinion must be based upon consideration of all evidence of record, and it must be in response to a hypothetical question which fairly sets out all of the claimant's impairments." McPherson v. Astrue, 605 F. Supp. 2d 744, 780 (S.D. W. Va. 2009) (citing Walker v. Bowen, 889 F.2d 47, 51 (4th Cir.1989)). "Nevertheless, . . . the questions need only reflect those impairments that are supported by the record." McPherson, 605 F. Supp. 2d at 780 (citing Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987)). Accordingly, an ALJ is not obligated to structure hypothetical questions accounting for impairments he found to be not severe or not credible when assessing the claimant's RFC, McPherson, 605 F. Supp. 2d at 780, nor is he required to rely on testimony resulting from such questions.

As noted above, the ALJ's conclusions regarding the severity of Plaintiff's limitations with respect to her asthma are supported by substantial evidence. The ALJ reviewed the medical and non-medical evidence and made credibility findings to support her RFC

formulation, which did not include a limitation related to Plaintiff's oxygen use. Plaintiff points to no evidence other than her own testimony that indicates that Plaintiff required oxygen after an hour of walking. Instead, the medical evidence indicates that Plaintiff was prescribed oxygen on an as needed basis, that Plaintiff's physicians encouraged her to exercise, and that objective medical findings did not indicate exercise-induced asthma. As discussed by the ALJ and noted above, Plaintiff underwent an exercise challenge on a treadmill in November 2014, which reflected "no evidence of EIB (Exercise-Induced Brochospasm) with exercise." (Tr. at 27, 703.) In addition, in January 2015, she reported to her doctor that she was walking one mile on a treadmill about every other day and denied shortness of breath. (Tr. at 628.) As the ALJ noted, "[t]he results of most physical examinations have been within normal limits, other than [Plaintiff's] level II obesity." (Tr. at 28.) Because (1) substantial evidence supports these findings as set out in the ALJ's decision, and (2) the hypothetical question challenged by Plaintiff fairly set forth all limitations described in Plaintiff's RFC, the Court finds no error.

IT IS THEREFORE RECOMMENDED that the Commissioner's decision finding no disability be AFFIRMED, that Plaintiff's Motion for Judgment Reversing the Commissioner [Doc. #8] be DENIED, that Defendant's Motion for Judgment on the Pleadings [Doc. #10] be GRANTED, and that this action be dismissed with prejudice.

This, the 17th day of August, 2018.

/s/ Joi Elizabeth Peake  
United States Magistrate Judge